# NEW ENGLAND POWER CO. *v.*
# NEW HAMPSHIRE ET AL.

No. 80–1208.   Argued December 7, 1981—Decided February 24, 1982*

---

*Together with No. 80–1471, *Massachusetts et al.* v. *New Hampshire et al.;* and No. 80–1610, *Roberts, Attorney General of Rhode Island, et al.* v. *New Hampshire et al.*, also on appeal from the same court.

332

BURGER, C. J., delivered the opinion for a unanimous Court.

*Samuel Huntington* argued the cause for appellant in No. 80–1208. With him on the briefs were *John F. Sherman III, Edward Berlin, Carmen D. Legato,* and *J. Phillip Jordan. Donald K. Stern,* Assistant Attorney General of Massachusetts, argued the cause for appellants in Nos. 80–1471 and 80–1610. With him on the brief for appellants in No. 80–1471 were *Francis X. Bellotti,* Attorney General, *Thomas R. Kiley,* First Assistant Attorney General, and *Joan C. Stod-*

*dard, E. Michael Sloman,* and *Alan Sherr,* Assistant Attorneys General. *Dennis J. Roberts II,* Attorney General of Rhode Island, and *John R. McDermott* filed a brief for appellants in No. 80–1610.

*Gregory H. Smith,* Attorney General of New Hampshire, argued the cause for appellees. With him on the brief was *Peter C. Scott,* Assistant Attorney General.†

CHIEF JUSTICE BURGER delivered the opinion of the Court.

These three consolidated appeals present the question whether a state can constitutionally prohibit the exportation of hydroelectric energy produced within its borders by a federally licensed facility, or otherwise reserve for its own citizens the "economic benefit" of such hydroelectric power.

I

Appellant New England Power Co. is a public utility which generates and transmits electricity at wholesale. It sells 75% of its power in Massachusetts and much of the remainder in Rhode Island; less than 6% of New Hampshire's population is serviced by New England Power's wholesale customers. New England Power owns and operates six hydroelectric generating stations on the Connecticut River, consisting of 27 generating units. Twenty-one of these units—with a capacity of 419.8 megawatts, or about 10% of New England Power's total generating capacity—are located within the State of New Hampshire. The units are licensed by the Federal En-

---

†Briefs of *amici curiae* urging reversal were filed by *Acting Solicitor General Wallace, Stuart A. Smith,* and *Jerome M. Feit* for the United States et al.; by *Robert L. Baum* and *Ronald D. Jones* for the Edison Electric Institute; by *Joseph D. Alvaini* for the New England Legal Foundation et al.; by *James R. McIntosh* and *Allan B. Taylor* for the New England Power Pool Executive Committee; and by *Robert C. McDiarmid* for the Unaffiliated Massachusetts Municipal Wholesale Customers of New England Power Co.

ergy Regulatory Commission pursuant to Part I of the Federal Power Act, 41 Stat. 1063, as amended, 16 U. S. C. §§ 791a–823 (1976 ed. and Supp. IV). Since hydroelectric facilities operate without significant fuel consumption, these units can produce electricity at substantially lower cost than most other generating sources.

New England Power is a member of the New England Power Pool, whose utility-members own over 98% of the total generation capacity, and virtually all of the transmission facilities, in the six-state region. The objectives of the Power Pool, as described in the agreement among its members, are to assure the reliability of the region's bulk power supply and to attain "maximum practicable economy" through, inter alia, "joint planning, central dispatching . . . and coordinated construction, operation and maintenance of electric generation and transmission facilities owned or controlled by the Participants . . . ." New England Power Pool Agreement § 4.1, App. 31a. All member-owned generating facilities are placed under the control of the Power Pool's Dispatch Center. A computer calculates the cost of generation for each generating unit and assigns each unit an operating schedule that will minimize the cost of the region's total power supply. Power generated at the various units, including New England Power's Connecticut River hydroelectric stations, flows freely through the Pool's regional transmission network, or "grid." The energy is dispatched to members' customers as their power needs arise, without regard to generating source. The Pool bills each member the amount it would have cost the utility to meet its customers' load using only its own generating sources, minus that member's share of the savings resulting from the centralized dispatch system.[1]

---

[1] Testimony before the New Hampshire Public Utilities Commission in these cases indicated that the savings have been substantial. For example, in 1979, the savings attributable to the Power Pool's centralized dis-

A New Hampshire statute, enacted in 1913, provides:

> "No corporation engaged in the generation of electrical energy by water power shall engage in the business of transmitting or conveying the same beyond the confines of the state, unless it shall first file notice of its intention so to do with the public utilities commission and obtain an order of said commission permitting it to engage in such business." N. H. Rev. Stat. Ann. § 374:35 (1966).

The statute empowers the New Hampshire Commission to prohibit the exportation of such electrical energy when it determines that the energy "is reasonably required for use within this state and that the public good requires that it be delivered for such use." *Ibid.*

Since 1926, New England Power or a predecessor company periodically applied for and obtained approval from the New Hampshire Commission to transmit electricity produced at the Connecticut River plants to points outside New Hampshire. However, on September 19, 1980, after an investigation and hearings, the Commission withdrew the authority formerly granted New England Power to export its hydroelectric energy, and ordered the company to "make arrangements to sell the previously exported hydroelectric energy to persons, utilities and municipalities within the State of New Hampshire . . . ."[2] In its report accompanying the order,

---

patch system were reported at over $44 million. App. 35a, 56a. See generally Federal Energy Regulatory Commission, Office of Electric Power Regulation, Power Pooling in the United States 15–23, 39–41, 69–79 (1981), for a description of efficiencies attributable to pooling arrangements.

[2] The order reads:

"ORDERED, that the permission granted New England Power Company (NEPCO) to transmit hydroelectric energy from within the boundaries of the State to outside the State is hereby withdrawn as of thirty (30) days from the date of this Order; and it is

"FURTHER ORDERED, that NEPCO make arrangements to sell the previously exported hydroelectric energy to persons, utilities and munici-

the Commission found that New Hampshire's population and energy needs were increasing rapidly; that, primarily because of its low "generating mix" of hydroelectric energy, the Public Service Company of New Hampshire, the State's largest electric utility, had generating costs about 25% higher than those of New England Power; and that if New England Power's hydroelectric energy were sold exclusively in New Hampshire, New Hampshire customers could save approximately $25 million a year. The Commission therefore concluded that New England Power's hydroelectric energy was "required for use within the State" of New Hampshire, and that discontinuation of its exportation would serve the "public good." App. to Juris. Statement in No. 80–1208, pp. 25–39.

The Commission did not, however, order New England Power to sever its connections with the Power Pool. So long as the electricity produced at New England Power's hydroelectric plants continues to flow through the Pool's regional transmission network, it will be impossible to contain that electricity within the State of New Hampshire in any physical sense. Although the precise contours of the Commission's order are unclear, it appears to require that New England Power sell electricity to New Hampshire utilities in an amount equal to the output of its in-state hydroelectric facilities, at special rates adjusted to reflect the entire savings attributable to the low-cost hydroelectric generation.[3]

palities within the State of New Hampshire within thirty (30) days of the date of this Order; and it is

"FURTHER ORDERED, that upon the completion of both units at Seabrook the Commission will again re-examine the issue of exportation."

[3] For example, the Commission's staff economist testified at the hearings that New England Power could "allocate the benefits of low-cost hydroelectric power to New Hampshire through billing mechanisms" pursuant to which the power would be sold in New Hampshire at "economic cost"— i. e., the cost of producing the power, including depreciation, plus a return on invested capital. App. 38a–39a. The economist's analysis of the

New England Power, the Commonwealth of Massachusetts, and Dennis J. Roberts II, Attorney General of Rhode Island, appealed the Commission's order to the Supreme Court of New Hampshire. They contended that the order was pre-empted by Parts I and II of the Federal Power Act, 16 U. S. C. §§ 791a–824k (1976 ed. and Supp. IV), and imposed impermissible burdens on interstate commerce. The court rejected these arguments, concluding that the "saving clause" of § 201(b) of the Federal Power Act, 16 U. S. C. § 824(b) (1976 ed., Supp. IV), granted New Hampshire authority to restrict the interstate transportation of hydroelectric power generated within the State. *Appeal of New England Power Co.*, 120 N. H. 866, 876–877, 424 A. 2d 807, 814 (1980).[4] The court further held that the New Hampshire Commission's order did not interfere with the Federal Energy Regulatory Commission's exclusive regulatory authority over rates charged for interstate sales of electricity at wholesale. It thus remanded the case to permit the parties to "develop the mechanics of implemention" of the New

benefits which would ensue from restricting the "exportation" of hydroelectric energy in this manner—upon which the New Hampshire Commission relied heavily in its report—was based on the assumption that New England Power would simply enter into new unit power contracts with New Hampshire utilities for an amount of kilowatt hours equal to New England Power's average hydroelectric generation over the course of a number of years. 3 Tr. of Hearings before the N. H. Public Utilities Comm'n in DE 79–223, pp. 23–24, 1–35. Although the record is not entirely clear on this point, it appears that the "economic benefit," or "savings," attributable to New England Power's hydroelectric facilities is currently reflected in the company's general wholesale rates, and thus shared pro rata by its customers in Massachusetts, Rhode Island, and New Hampshire. App. 15a–18a. See also Brief for Appellant in No. 80–1208, p. 7.

[4] The court also dismissed several arguments advanced only by appellants Massachusetts and Roberts—that § 201(b), as so interpreted, exceeded Congress' power under the Commerce Clause, Art. I, § 8, cl. 3, and violated both the Privileges and Immunities Clause, Art. IV, § 2, cl. 1, and the Tenth Amendment of the Constitution.

Hampshire Commission's order, and mandated that New England Power "make appropriate adjustments and filings with the appropriate federal and State administrative agencies to enable New Hampshire to regain the benefit of its hydroelectric power." *Id.*, at 878–879, 424 A. 2d, at 815.[5]

We noted probable jurisdiction, 451 U. S. 981 (1981), and we reverse.

## II

The Supreme Court of New Hampshire recognized that, absent authorizing federal legislation, it would be "questionable" whether a state could constitutionally restrict interstate trade in hydroelectric power. 120 N. H., at 876, 424 A. 2d, at 814. Our cases consistently have held that the Commerce Clause of the Constitution, Art. I, § 8, cl. 3, precludes a state from mandating that its residents be given a preferred right of access, over out-of-state consumers, to natural resources located within its borders or to the products derived therefrom. *E. g.*, *Hughes* v. *Oklahoma*, 441 U. S. 322 (1979); *Pennsylvania* v. *West Virginia*, 262 U. S. 553 (1923); *West* v. *Kansas Natural Gas Co.*, 221 U. S. 229 (1911). Only recently, in *Philadelphia* v. *New Jersey*, 437 U. S. 617, 627 (1978), we reiterated that "[t]hese cases stand for the basic principle that a 'State is without power to prevent privately owned articles of trade from being shipped and sold in interstate commerce on the ground that they are required to satisfy local demands or because they are needed by the people of the State'" (quoting *Foster-Fountain Packing Co.* v. *Haydel*, 278 U. S. 1, 10 (1928)).[6]

---

[5] The parties inform us that the New Hampshire Commission has refrained from acting on remand pending this Court's disposition of the appeals.

[6] We find no merit in New Hampshire's attempt to distinguish these cases on the ground that it "owns" the Connecticut River, the source of New England Power's hydroelectricity. Whatever the extent of the State's proprietary interest in the river, the pre-eminent authority to regu-

The order of the New Hampshire Commission, prohibiting New England Power from selling its hydroelectric energy outside the State of New Hampshire, is precisely the sort of protectionist regulation that the Commerce Clause declares off-limits to the states. The Commission has made clear that its order is designed to gain an economic advantage for New Hampshire citizens at the expense of New England Power's customers in neighboring states. Moreover, it cannot be disputed that the Commission's "exportation ban" places direct and substantial burdens on transactions in interstate commerce. See *Public Utilities Comm'n* v. *Attleboro Steam & Electric Co.*, 273 U. S. 83 (1927). Such state-imposed burdens cannot be squared with the Commerce Clause when they serve only to advance "simple economic protectionism." *Philadelphia* v. *New Jersey, supra,* at 624.

The Supreme Court of New Hampshire nevertheless upheld the order of the New Hampshire Commission on the ground that § 201(b) of the Federal Power Act expressly permits the State to prohibit the exportation of hydroelectric power produced within its borders. It is indeed well settled

---

late the flow of navigable waters resides with the Federal Government, *United States* v. *Twin City Power Co.*, 350 U. S. 222 (1956), which has licensed New England Power to operate its Connecticut River hydroelectric plants pursuant to a determination that those facilities are "best adapted to a comprehensive plan for improving or developing a waterway or waterways for the use or benefit of interstate or foreign commerce," 16 U. S. C. § 803(a). New Hampshire's purported "ownership" of the Connecticut River therefore provides no justification for restricting or conditioning the use of these federally licensed units. See *First Iowa Hydro-Electric Cooperative* v. *FPC*, 328 U. S. 152 (1946). Moreover, New Hampshire has done more than regulate use of the resource it assertedly owns; it has restricted the sale of electric energy, a product entirely distinct from the river waters used to produce it. See *Utah Power & Light Co.* v. *Pfost*, 286 U. S. 165, 179–181 (1932). This product is manufactured by a private corporation using privately owned facilities. Thus, New Hampshire's reliance on *Reeves, Inc.* v. *Stake*, 447 U. S. 429 (1980)—holding that a state may confine to its residents the sale of products it *produces*—is misplaced.

that Congress may use its powers under the Commerce Clause to "[confer] upon the States an ability to restrict the flow of interstate commerce that they would not otherwise enjoy." *Lewis* v. *BT Investment Managers, Inc.*, 447 U. S. 27, 44 (1980). See *Southern Pacific Co.* v. *Arizona ex rel. Sullivan*, 325 U. S. 761, 769 (1945). The dispositive question, however, is whether Congress in fact has authorized the states to impose restrictions of the sort at issue here.

## III

The national concern for planning, development, and comprehensive utilization of the country's water resources was very early expressed by Congress under its Commerce Clause powers. The Federal Water Power Act, now Part I of the Federal Power Act, 16 U. S. C. §§ 791a–823 (1976 ed. and Supp. IV), was enacted in 1920. The potential of water power as a source of electric energy led Congress to exercise its constitutional authority over navigable streams to regulate and encourage development of hydroelectric power generation "to meet the needs of an expanding economy." *FPC* v. *Union Electric Co.*, 381 U. S. 90, 99 (1965).

In 1935, Congress enacted Part II of the Federal Power Act, 16 U. S. C. §§ 824–824k (1976 ed. and Supp. IV), which delegated to the Federal Power Commission, now the Federal Energy Regulatory Commission, exclusive authority to regulate the transmission and sale at wholesale of electric energy in interstate commerce, without regard to the source of production. *United States* v. *Public Utilities Comm'n of California*, 345 U. S. 295 (1953). The 1935 enactment was a "direct result" of this Court's holding in *Public Utilities Comm'n* v. *Attleboro Steam & Electric Co.*, *supra*, that the states lacked power to regulate the rates governing interstate sales of electricity for resale. *United States* v. *Public Utilities Comm'n of California*, *supra*, at 311. Part II of the Act was intended to "fill the gap" created by *Attleboro* by establishing exclusive federal jurisdiction over such sales. 345 U. S., at 307–311.

Section 201(b) of the Act provides, *inter alia*, that the provisions of Part II "shall not . . . deprive a State or State commission of its lawful authority now exercised over the exportation of hydroelectric energy which is transmitted across a State line." However, this provision is in no sense an affirmative grant of power to the states to burden interstate commerce "in a manner which would otherwise not be permissible." *Southern Pacific Co.* v. *Arizona ex rel. Sullivan, supra,* at 769. In § 201(b), Congress did no more than leave standing whatever valid state laws then existed relating to the exportation of hydroelectric energy; by its plain terms, § 201(b) simply saves from pre-emption under Part II of the Federal Power Act such state authority as was otherwise "lawful." The legislative history of the Act likewise indicates that Congress intended only that its legislation *"tak[e] no authority from* State commissions." H. R. Rep. No. 1318, 74th Cong., 1st Sess., 8 (1935) (emphasis added). Nothing in the legislative history or language of the statute evinces a congressional intent "to alter the limits of state power otherwise imposed by the Commerce Clause," *United States* v. *Public Utilities Comm'n of California, supra,* at 304, or to modify the earlier holdings of this Court concerning the limits of state authority to restrain interstate trade. *E. g., Pennsylvania* v. *West Virginia,* 262 U. S. 553 (1923); *West* v. *Kansas Natural Gas Co.,* 221 U. S. 229 (1911). Rather, Congress' concern was simply "to define the extent of the federal legislation's pre-emptive effect on state law." *Lewis* v. *BT Investment Managers, Inc., supra,* at 49.[7]

To support its argument to the contrary, New Hampshire relies on a single statement made on the floor of the House of

---

[7] Indeed, had Congress intended § 201(b) to confer upon the states powers which they would have lacked in the absence of the federal legislation, it would have been anomalous to speak in terms of "authority *now exercised.*" This language plainly assumes the prior existence of valid state authority; in addition, it appears to limit the saving effect of the provision to those few States in which the authority was in fact "exercised" in 1935.

Representatives during the debates preceding enactment of Part II. Congressman Rogers of New Hampshire stated:

> "[T]he Senate bill as originally drawn would deprive certain States, I think five in all, of certain rights which they have over the exportation of hydroelectric energy which is transmitted across the State line. This situation has been taken care of by the House committee, and I hope when you come to it, section 201 of part II, that you will grant us the privilege to continue, as we have been for 22 years, to exercise our State right over the exportation of hydroelectric energy transmitted across State lines but produced up there in the granite hills of old New Hampshire." 79 Cong. Rec. 10527 (1935).

From this expression of "hope," New Hampshire concludes that Congress specifically intended to preserve the very statute at issue here.

Reliance on such isolated fragments of legislative history in divining the intent of Congress is an exercise fraught with hazards, and "a step to be taken cautiously." *Piper* v. *Chris-Craft Industries, Inc.*, 430 U. S. 1, 26 (1977); *United States* v. *Public Utilities Comm'n of California, supra*, at 319–321 (Jackson, J., concurring). However, even were we to accord significant weight to Congressman Rogers' statement, it would not support New Hampshire's contention that § 201(b) was intended to permit states to regulate free from Commerce Clause restraint. Congressman Rogers simply urged his colleagues not to "deprive" the State of New Hampshire of "rights" it already possessed—*i. e.*, to ensure that the Act itself would not be read as pre-empting otherwise valid state legislation.

To be sure, some Members of Congress may have thought that no further protection of state authority was needed.[8]

---

[8] On the other hand, it would not have been at all unusual had Congress taken care that the 1935 enactment not displace state authority in the area,

Indeed, given that the Commerce Clause—independently of the Federal Power Act—restricts the ability of the states to regulate matters affecting interstate trade in hydroelectric energy, § 201(b) may in fact save little in the way of "lawful" state authority.[9]   But when Congress has not "expressly stated its intent and policy" to sustain state legislation from attack under the Commerce Clause, *Prudential Ins. Co.* v. *Benjamin*, 328 U. S. 408, 427, 431 (1946), we have no authority to rewrite its legislation based on mere speculation as to what Congress "probably had in mind."   See *United States* v. *Public Utilities Comm'n of California*, 345 U. S., at 319 (Jackson, J., concurring); see also *id.*, at 311.   We must construe § 201(b) as it is written, and as its legislative history indicates it was intended—as a standard "nonpre-emption" clause.[10]

---

without consideration of the scope of that authority or the extent to which it might be constrained by other provisions of federal law.   See *Milwaukee* v. *Illinois*, 451 U. S. 304, 329, n. 22 (1981).

  [9] We need not speculate here as to the precise contours of § 201(b)'s saving effect.

  [10] Even were we to conclude that Congress intended § 201(b) to override restraints placed on state regulatory power by the Commerce Clause, there would remain a substantial question whether the order of the New Hampshire Commission was entitled to protection under that provision. Section 201(b) seeks to protect only state regulation relating to the "exportation" of hydroelectric power.   However, New England Power cannot terminate its out-of-state transmission of hydroelectricity without substantial alterations in the regional transmission system to which its hydroelectric facilities are connected—alterations which the New Hampshire Commission did not appear to contemplate would be made.   *Appeal of New England Power Co.*, 120 N. H. 866, 876–877, 424 A. 2d 807, 814 (1980). The operative effect of the Commission's order would be to compel New England Power to enter into new wholesale contracts with New Hampshire utilities, at rates fixed by the New Hampshire Commission to reflect the "economic cost" of the company's hydroelectric production.   See *supra*, at 336, and n. 3.   Appellants argue that such state regulation is incompatible with Part II of the Federal Power Act—which vests in the Federal Energy Regulatory Commission exclusive ratemaking jurisdiction

## IV

We conclude, therefore, that New Hampshire has sought to restrict the flow of privately owned and produced electricity in interstate commerce, in a manner inconsistent with the Commerce Clause. Section 201(b) of the Federal Power Act does not provide an affirmative grant of authority to the State to do so. For these reasons, the judgment of the Supreme Court of New Hampshire is reversed, and the case is remanded for further proceedings not inconsistent with this opinion.

*So ordered.*

---

over "the sale of electric energy at wholesale in interstate commerce," 16 U. S. C. §§ 824(b), 824d–824f (1976 ed. and Supp. IV)—and conflicts directly with § 205(b) of the Federal Power Act, 16 U. S. C. § 824d(b), which prohibits utilities from maintaining "any unreasonable difference in rates . . . as between localities" with respect to sales subject to federal jurisdiction. Given our holding that the New Hampshire Commission's order violates the Commerce Clause, we need not decide this issue.