William P. SADLER, Barbara K. Sadler, and American Telephone and Telegraph Company, Plaintiffs–Appellees,

v.

NCR CORPORATION,
Defendant–Appellant.

No. 1283, Docket 91–7018.

United States Court of Appeals,
Second Circuit.

Argued Feb. 8, 1991.

Decided March 7, 1991.

Greg A. Danilow, New York City (Dennis J. Block, Joseph S. Allerhand, Richard L. Levine, Jacqueline Abramson, Weil, Gotshal & Manges, New York City, on the brief), for defendant-appellant.

Michael W. Schwartz, New York City (Bernard W. Nussbaum, William C. Sterling, Jr., Barbara Robbins, Stephen R. Neuwirth, Jeffrey I. Lang, Wachtell, Lipton, Rosen & Katz, New York City; Charles W. Douglas, William O. Fifield, David F. Graham, Sidley & Austin, Chicago, Ill., on the brief), for plaintiffs-appellees.

Robert I. Harwood, Wechsler Skirnick Harwood Halebian & Feffer, New York City (Stephen G. Schulman, Milberg Weiss Bershad Specthrie & Lerach, New York City; Curtis V. Trinko, New York City, on the brief), filed a brief on behalf of amici curiae NCR Shareholder Class plaintiffs.

Before FEINBERG, NEWMAN, and WALKER, Circuit Judges.

JON O. NEWMAN, Circuit Judge:

This appeal concerns a limited but potentially important tactic in proxy contests—a stockholder's demand for a list of record shareholders and a list of beneficial owners of shares who do not object to disclosure of their names ("NOBO list"). The appeal raises issues under New York state law and the United States Constitution as to the power of New York to require an out-of-state corporation, doing business within New York, to provide resident shareholders with the list of record stockholders and to compile and produce the NOBO list, under circumstances where the requesting shareholders could not obtain such lists under the law of the state of incorporation. The lists are sought in connection with a tender offer and the solicitation of proxy votes in an effort to replace directors. These issues arise on an appeal by NCR Corporation ("NCR") from the January 28, 1991, order of the District Court for the Southern District of New York (Louis L. Stanton, Judge) requiring NCR to produce the lists in a suit filed by William P. and Barbara K. Sadler and American Telephone and Telegraph Co. ("AT & T"). The Sadlers and AT & T are shareholders of NCR.

We conclude that New York law authorizes production of the shareholder and NOBO lists in the circumstances of this case and that application of New York law does not violate the Commerce Clause of the Constitution. We therefore affirm.

Background

NCR, a large computer company, is incorporated in Maryland and has its principal place of business in Dayton, Ohio. It is undisputed that NCR maintains at least eight offices in New York and conducts substantial business there. NCR has 75,000 shareholders. AT & T, the well-known telecommunications company, is a New York corporation with its principal executive offices in New York City. AT & T became a beneficial owner of 100 shares of NCR stock on November 21, 1990. The Sadlers are New York residents who own more than 6,000 shares of NCR stock and have been record holders of NCR stock for more than six months prior to this lawsuit.

On December 6, 1990, AT & T began a tender offer for the shares of NCR, offering to purchase all of the common stock of NCR for $90 a share. In compliance with Rule 14d–5 of the Securities and Exchange Commission, 17 C.F.R. § 240.14d–5 (1990), NCR mailed the offer to purchase to all NCR stockholders. The NCR board rejected the tender offer and declined to redeem a "poison pill" shareholders' rights plan,

which presented and continues to present an obstacle to a hostile tender offer. AT & T responded to this opposition by soliciting NCR shareholders to convene a special meeting of stockholders to replace a majority of the NCR directors so that the barriers to the tender offer could be removed. Maryland law permits a special meeting of stockholders to be called upon the request of stockholders entitled to cast 25 percent of the votes at the meeting. Md. Corps. & Ass'ns Code Ann. § 2–502 (1985 & Supp. 1990). NCR's corporate charter permits directors to be replaced at a special meeting of stockholders upon the affirmative vote of 80 percent of all outstanding shares. Soon after soliciting calls for a special meeting, AT & T submitted to NCR requests for a special meeting from holders of more than half of NCR stock. NCR subsequently scheduled a special meeting for March 28, 1991, the date selected for its annual meeting.

Beginning in early January 1991, AT & T and the Sadlers, acting at AT & T's request, sought from NCR its stockholder list and related materials to facilitate communication with owners of NCR shares. In addition to the list of record owners, AT & T sought a magnetic computer tape of the list and daily transfer sheets showing changes in shareholders from the date of demand to the date of the annual meeting. AT & T also sought two other lists, a "CEDE list" and a "NOBO list." A "CEDE list" identifies the brokerage firms and other record owners who bought shares in a street name for their customers and who have placed those shares in the custody of depository firms such as Depository Trust Co.; these shares are reflected in the corporation's records only under the names of nominees used by such depository firms. Depository Trust Co. uses "CEDE & Co." as the name of the nominee for shares it holds for brokerage firms, and such lists, regardless of the nominee names adopted by other depository firms, are known as "CEDE lists." *See Hatleigh Corp. v. Lane Bryant, Inc.*, 428 A.2d 350, 353–54 (Del.Ch.1981) (quoting description in *Giovanini v. Horizon Corp.*, C.A. # 5961–NC (Del.Ch. Sept. 12, 1979)). A "NOBO list" (non-objecting beneficial owners) contains the names of those owning beneficial interests in shares of a corporation who have given consent to the disclosure of their identities. The Securities and Exchange Commission requires brokers and other record holders of stock in street name to compile a NOBO list at a corporation's request. *See* SEC Rule 14b–1(c), 17 C.F.R. § 240.14b–1(c) (1990).

Upon NCR's refusal to produce the requested materials, the Sadlers and AT & T brought this suit in the Southern District, relying on section 1315 of the New York Business Corporation Law, N.Y.Bus. Corp.Law § 1315 (McKinney 1986). Section 1315, which we consider in detail below, enables New York residents owning shares of a foreign corporation to obtain a list of the corporation's shareholders. On January 28, 1991, the District Court ruled that the Sadlers qualified under section 1315 to obtain NCR's stockholder list and that the statute could constitutionally be applied to require NCR to comply with their request, notwithstanding NCR's Commerce Clause objections. Later that day, Judge Stanton issued a supplemental ruling rejecting NCR's contention that the NOBO list was not producible under section 1315 because it was not then in existence but required compilation. He entered an order requiring NCR to produce all the materials sought by the Sadlers and AT & T.

This Court stayed the District Court's order and heard the appeal on an expedited basis on February 8. On February 11, we vacated all aspects of the stay except those relating to the NOBO list, on condition that NCR would promptly request compilation of a NOBO list, without prejudice to its rights. On February 20, we vacated the stay in its entirety, thereby permitting the District Court's order to go into effect.

## Discussion

### I. Application of section 1315

Section 1315(a) permits any New York resident who for six months has been a stockholder of record of a foreign corpora-

tion doing business in New York, or who holds or acts for those who hold five percent of any class of outstanding shares to require the corporation, on five days' written notice, to produce "a record of its shareholders setting forth the names and addresses of all shareholders, the number and class of shares held by each and the dates when they respectively became the owners of record." N.Y. Bus. Corp. Law (McKinney 1986). Such a resident is also entitled "to examine in person or by agent ... the record of shareholders" at specified locations. *Id.* The corporation may require the requesting shareholder to furnish an affidavit assuring that "inspection is not desired for a purpose ... other than the business of" the corporation and that the shareholder has not engaged in the sale of stockholder lists within the past five years. *Id.* § 1315(b). A substantially similar provision of New York law applies to stockholder lists of New York corporations. N.Y. Bus. Corp. Law § 624 (McKinney 1986). *See Crane Co. v. Anaconda Co.,* 39 N.Y.2d 14, 18–20, 346 N.E.2d 507, 510–11, 382 N.Y.S.2d 707, 710–11 (1976) (outlining origin of the New York statutory right to inspect stockholder lists).

A. *Eligibility of the Sadlers.*

■ The Sadlers qualify under section 1315 as persons entitled to obtain a "record" of NCR's shareholders. The Sadlers are residents of New York and have owned NCR stock for six months prior to their demand. The corporation whose stockholder list they seek does business in New York.

Nevertheless, NCR challenges the Sadlers' right to invoke section 1315 because of the arrangement between the Sadlers and AT & T under which the Sadlers initiated their request. Since AT & T had not held its NCR stock for more than six months, it sought out a New York resident who qualified under section 1315. AT & T's agreement with the Sadlers provides that the Sadlers will demand the NCR stockholder list, that AT & T will reimburse the Sadlers for any expenses and indemnify them for any losses arising out of the demand, and that the Sadlers will

not settle any claim or lawsuit concerning the demand without the consent of AT & T, which will not be unreasonably withheld. Pursuant to this agreement, the Sadlers requested that NCR produce the stockholder records to AT & T, which it characterized as "our agent," and informed NCR that AT & T would reimburse NCR for any expenses incurred in complying with the demand. NCR contends that AT & T is not the agent of the Sadlers, but in reality is the principal, using the Sadlers as its agent for a demand that AT & T itself is not entitled to make.

We agree with Judge Stanton that the agreement between the Sadlers and AT & T does not disqualify the Sadlers from invoking section 1315. Though section 1315 permits an "agent" to act for the qualifying New York resident in inspecting the shareholder record, it does not inevitably apply all the technical aspects of the law of agency to the permissible relationship between the requesting shareholder and another entity with whom the shareholder chooses to act. Section 1315 "should be liberally construed in favor of the stockholder," *Crane Co.,* 39 N.Y.2d at 20–21, 346 N.E.2d at 512, 382 N.Y.S.2d at 712. Once the resident shareholder alleges compliance with the statute, "the *bona fides* of the shareholder will be assumed ... and it becomes incumbent on the corporation to justify its refusal by showing an improper purpose or bad faith." *Id.* at 20, 346 N.E.2d at 511, 382 N.Y.S.2d at 711 (citations omitted).

■ We see no reason to believe that New York would deny the Sadlers the right to invoke section 1315 because of the arrangement they have made with AT & T. Though that arrangement gives AT & T considerable control of the demand, particularly the right reasonably to refuse settlement of the demand or litigation arising from it, that control was agreed to by the Sadlers in exchange for AT & T's assurance that they would incur no financial exposure. Since New York wishes to accord its residents the rights specified in section 1315, it is not likely to impose any restrictions upon their exercise of that

right, other than those specified in the statute, unless necessary to prevent the statute from being used in bad faith. Nothing in the arrangement between the Sadlers and AT & T creates a risk of using the statute for an improper purpose or in bad faith. The demanding stockholder is entitled to turn the list over to others involved in a proxy contest, *see In re Lopez*, 71 A.D.2d 976, 420 N.Y.S.2d 225 (1st Dep't 1979), and we see no reason why he may not make reasonable arrangements to avoid his own financial exposure.

## B. *The demand for the NOBO list.*

■ Whether New York law entitles the Sadlers to require NCR to assemble a NOBO list presents a more substantial question. The parties agree that section 1315 applies to NOBO lists in a corporation's possession, but it is undisputed that at the time of the demand, NCR did not have a NOBO list in its possession. It is also undisputed that a corporation can obtain a NOBO list, normally within ten days, by requesting compilation of the list by firms that offer data processing services for this task. NCR reads section 1315 as limited to production of lists in existence, as distinguished from those readily capable of being compiled. NCR contends that no court has ever required a corporation to compile a NOBO list, and relies on a New York decision, *Bohrer v. International Banknote Co.*, 150 A.D.2d 196, 540 N.Y. S.2d 445 (1st Dep't 1989), and a Delaware decision, *R.B. Associates v. The Gillette Co.*, C.A. No. 9711, 1988 WL 27731 (Del.Ch. Mar. 22, 1988), for the proposition that stockholders are not entitled to have such lists compiled. AT & T reads these decisions more narrowly and finds them distinguishable, and argues that New York would require compilation of a NOBO list in this case in view of the NCR requirement that directors may be replaced at a special meeting only upon the affirmative vote of 80 percent of the stockholders. Judge Stanton concluded that the case law

did not provide an answer and ruled that it would not be "equitable" to deny AT & T an opportunity to communicate with the NOBOs in view of NCR's 80 percent rule.

The text of section 1315 does not resolve the dispute, although a narrow reading of its terms might favor NCR. The statute could be read to be limited to production or examination of lists already in existence and could also be limited to lists reflecting the names and addresses of owners of record. But New York courts have made clear that the statute is to be "liberally construed," *Crane Co.*, 39 N.Y.2d at 20–21, 346 N.E.2d at 512, 382 N.Y.S.2d at 712, to "facilitate communication among shareholders on issues respecting corporate affairs," *Bohrer*, 150 A.D.2d at 196, 540 N.Y. S.2d at 446.[1] A narrow reading of section 1315 would therefore not accord with New York law.

The precise issue of whether New York requires a corporation to obtain a NOBO list at the request of a shareholder qualified to demand stockholder records under section 1315 has not previously been decided. *Bohrer* implicates the issue but does not resolve it. The demand in that case, as presented to the trial court, included the following:

> The Record containing all information in or which comes into the Corporation's possession or control, *or which can reasonably be obtained from* brokers, dealers, banks, clearing agencies or voting trustees relating to the names of the beneficial owners of the Corporation's common stock and preferred stock (commonly known as "NOBO's")....

Record on Appeal at 110, *Bohrer* (emphasis added). This portion of the applicant's proposed order was entirely deleted by the trial judge. On appeal, the applicant complained that the corporation had refused to make available "shareholder identification records *in its possession*," Brief for Appellant at 13, *Bohrer* (emphasis added), and contended that "if [the corporation] *has or*

---

**1.** *Bohrer* construed the provision of New York law concerning disclosure of stockholder lists of New York corporations, N.Y.Bus.Corp.Law § 624 (McKinney 1986), but it is clear that the

New York courts construe the provisions respecting domestic and foreign corporations *in pari materia, see Crane Co.*, 39 N.Y.2d at 19–20, 346 N.E.2d at 511, 382 N.Y.S.2d at 711.

*intends to obtain* a NOBO list, it must be promptly produced....," *id.* at 23 (emphasis added). The Appellate Division was not asked to order the corporation to compile a NOBO list, and its ruling granting the applicant access to "any 'NOBO' list currently in the possession of the corporation," or that "comes into the possession of" the corporation, *Bohrer,* 150 A.D.2d at 196, 540 N.Y.S.2d at 446, cannot be taken as a rejection of such a request.

Other courts, however, construing statutes similar to section 1315, have expressly declined to order compilation of NOBO lists. *RB Associates, supra; Cenergy Corp. v. Bryson Oil & Gas P.L.C.,* 662 F.Supp. 1144, 1148 (D.Nev.1987). The matter was given extended consideration by Chancellor Allen in *RB Associates.* In declining to order compilation of a NOBO list, he distinguished it in two respects from CEDE lists, which Delaware and New York require a corporation to compile upon request of a qualified shareholder. *RB Associates, supra; Hatleigh Corp.,* 428 A.2d at 353–54; *Bohrer,* 150 A.D.2d at 196, 540 N.Y.S.2d at 446. CEDE lists, he pointed out, can be generated rapidly by a computer, whereas a NOBO list takes up to ten days to compile. Second, he expressed the view that it would be extremely inefficient without a CEDE list to attempt to distribute proxy materials to persons for whom a depository company holds shares, whereas a NOBO list "plays no central role in a proxy contest." *RB Associates, supra.*

We do not find either distinction compelling. Since compilation of a NOBO list is a relatively simple mechanical task, the fact that compilation takes longer than for a CEDE list is an insubstantial basis for distinction. As to both sets of information, the underlying data exist in discrete records readily available to be compiled into an aggregate list. Nor are the functions of the lists significantly dissimilar. Both facilitate direct communication with stockholders, in the case of a NOBO list, at least with those beneficial owners who have indicated no objection to disclosure of their names and addresses.

Though Delaware chooses to construe the reach of its requirements on stockholder list disclosure narrowly in this respect, we think New York would construe section 1315 more generously. Once the Securities and Exchange Commission has acted to enable a corporation to obtain from brokers and other record owners a list of beneficial owners of its shares who do not object to such disclosure, we think New York would apply section 1315 to permit a qualifying shareholder to require the compilation and production of such a list.

Even if the statute might not require compilation of NOBO lists routinely, we agree with Judge Stanton that compilation was properly ordered in this case. The effect of NCR's 80 percent rule is to count as a "no" vote on the replacement of directors every share that is not voted at the special meeting. Thus, the shares of nonvoting beneficial owners who might oppose management if solicited by management opponents armed with a NOBO list are counted in favor of management. Denying such opponents an opportunity to contact the NOBOs is inconsistent with the statute's objective of seeking "to the extent possible, to place shareholders on an equal footing with management in obtaining access to shareholders." *Bohrer,* 150 A.D.2d at 196–97, 540 N.Y.S.2d at 446. In effect, NCR already has the votes of those NOBOs who, for lack of solicitation, decline to vote. As to them, NCR has all the access it needs.

## II. Commerce Clause Objection

■ NCR contends that application of section 1315 to require it to comply with demands for stockholder records that NCR is not required to honor under the law of the state of incorporation violates the Commerce Clause. The argument seeks to enlist the "dormant" Commerce Clause power, *see CTS Corp. v. Dynamics Corp. of America,* 481 U.S. 69, 87, 107 S.Ct. 1637, 1648, 95 L.Ed.2d 67 (1987), the implied prohibition upon certain types of state regulation arising from the available but unexercised power of Congress over interstate commerce. The prohibition has as its "principal objects" state regulations that

"discriminate against interstate commerce," *id.* at 87, 107 S.Ct. at 1648, and also extends to those that "adversely affect interstate commerce by subjecting activities to inconsistent regulations," *id.* at 88, 107 S.Ct. at 1649, or that impose burdens on interstate commerce that outweigh local benefits, *see Pike v. Bruce Church, Inc.,* 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970). NCR relies primarily on the "inconsistent regulation" branch of the dormant Commerce Clause doctrine.

Maryland law requires Maryland corporations to disclose stockholder lists to one or more shareholders who have held for at least six months at least five percent of the outstanding stock of any class. Md. Corps. & Ass'ns Code Ann. § 2–513(a) (1985). Neither AT & T nor the Sadlers meet the Maryland criteria. NCR contends that production of stockholder records pursuant to New York law subjects NCR to inconsistent regulation. We disagree.

■ Plainly there is no inconsistency in the sense of a direct conflict. Maryland law does not forbid NCR from disclosing its stockholder records to those who qualify under New York law. But, argues NCR, there is at least an indirect conflict in the sense that Maryland law permits NCR to refuse the Sadlers' request and New York law, as we construe it, forbids such refusal. That argument presses the "inconsistent regulation" branch of the dormant Commerce Clause theory too far. States are not prohibited from enacting regulations simply because they require more of an entity that is already subject to some less demanding regulation elsewhere.

However, NCR has a more plausible argument in pointing out that the Maryland disclosure obligations are not merely less generous than New York's, they are part of a balanced plan to regulate relations between a corporation and its shareholders. Maryland limits the shareholders who may demand inspection of stockholder records but at the same time extends shareholders a right to call a special meeting upon the request of those owning 25 percent of the shares. Md.Corps. & Ass'ns Code Ann. § 2–502 (1985 & Supp.1990). New York does not provide shareholders with any statutory right to call a special meeting. Thus, NCR's "conflict" argument is that New York law accords the Sadlers rights not only greater than those accorded by Maryland law, but rights that it is reasonable to assume the Maryland legislature implicitly wished to deny them in the course of adjusting the competing claims of management and shareholders.

This implied conflict argument requires consideration of the issue of whether regulation of the right of shareholders to inspect stockholder lists is confided to the exclusive authority of the state of regulation, or, more precisely, whether the dormant Commerce Clause power itself creates such an exclusive sphere of regulation. On these issues, the parties both seek to enlist the Supreme Court's decision in *CTS, supra.* As NCR reminds us, the Court there observed,

> No principle of corporation law and practice is more firmly established than a State's authority to regulate domestic corporations, including the authority to define the voting rights of shareholders. See Restatement (Second) of Conflict of Laws § 304 (1971) (concluding that the law of the incorporating State generally should "determine the right of a shareholder to participate in the administration of the affairs of the corporation").

*CTS,* 481 U.S. at 89, 107 S.Ct. at 1649. AT & T counters that the very section of the Restatement cited by the Court in support of the so-called "internal affairs" doctrine expressly excludes access to stockholder lists from the doctrine. As AT & T points out, Comment d to section 304 states:

> The right of a shareholder to inspect the books of a corporation poses special problems. This is an issue which can practicably be determined differently in different states. This is also an issue which, if decided differently in different states, will not seriously undermine the policy favoring uniform treatment for all shareholders of a corporation. For these reasons, a court will apply to a foreign corporation doing substantial business in the state a local statute providing for the

inspection of books by a shareholder if in the court's opinion the statute embodies an important policy.

Restatement (Second) of Conflict of Laws § 304, comment d (1971) (hereafter "Restatement"). *See, e.g., Jefferson Industrial Bank v. First Golden Bancorporation*, 762 P.2d 768 (Colo.App.1988); *Valtz v. Penta Investment Corp.*, 139 Cal.App.3d 803, 188 Cal.Rptr. 922 (4th Dist.1983); *McCormick v. Statler Hotels Delaware Corp.*, 55 Ill.App.2d 21, 203 N.E.2d 697 (1st Dist.1964). NCR's rebuttal claims, somewhat lamely, that the force of Comment d, promulgated in 1971, has been eroded by the increasing occurrence of proxy contests and by what it contends is the more significant role of stockholder lists today than in 1971. In surrebuttal, AT & T points out that in 1984 the Council of the American Law Institute undertook a "revision, on a selective basis, of those portions of the Restatement especially in need of updating in light of subsequent legal developments," *see* Foreword, *Restatement* (Supp.1988), and that the revisions approved in 1988 made no change in Comment d to § 304.

Though Comment d is relevant to the issue we confront, we do not think that this commentary, much less any aspect of the parties' conflicting exegeses on it, can be attributed to the Supreme Court by virtue of the citation to Section 304 in *CTS*. The Court was considering a Commerce Clause challenge to the power of a state to enact laws regulating tender offers for the shares of a domestic corporation. In upholding state power, the Court pertinently cited section 304 as an authoritative enunciation of the internal affairs doctrine. The Court had no occasion to consider under what circumstances a state could regulate any aspects of the internal affairs of a foreign corporation, and its citation of section 304 does not necessarily imply an endorsement of Comment d, even as a doctrine of conflicts of law, much less as a principle of constitutional law.

■ Though not necessarily endorsed by the Supreme Court in *CTS*, Comment d nevertheless substantially undermines NCR's claim that section 1315 subjects it to inconsistent regulation of a sort that the dormant Commerce Clause power prohibits. As the ALI and the case law have recognized, *see* Annot., 19 A.L.R.3d 869, 889–91 (1968), states have traditionally exercised authority to require disclosure of stockholder lists of foreign corporations doing business within their borders. Moreover, such authority will not normally create, and does not create in this case, the sort of irreconcilable conflict that would arise if a state purported to regulate voting rights or other aspects of the internal affairs of a foreign corporation that "admit only of one uniform system, or plan of regulation," *Cooley v. Board of Wardens*, 53 U.S. (12 How.) 143, 152, 13 L.Ed. 996 (1851). Access to stockholder lists is a recognized exception to the internal affairs doctrine as a matter of corporate law and conflicts of law, and it should take a substantial threat of conflict adversely affecting interstate commerce before a court invalidates a state's assertion of this traditional authority. Though Maryland may well have balanced limited shareholder access to stockholder lists with generous authority for calling special meetings, it did so against the background of traditional foreign state regulation of such access, and it cannot expect courts to provide constitutional insulation for the particular arrangements it adopted. If the traditional role of states concerning access to stockholder lists of foreign corporations is to be circumscribed, that alteration will have to be undertaken by Congress.

NCR's remaining Commerce Clause contentions require little discussion. Section 1315 creates no discrimination against interstate commerce. As Judge Stanton emphasized, it applies (for all practical purposes) equally to foreign and domestic corporations. NCR sees a discrimination in the statute's application only to New York resident shareholders. But New York is not giving its residents a preference as to anything that New York is purporting to regulate. New York leaves access by out-of-state shareholders within the regulatory authority of other states. There is here no preference of local residents concerning a local resource, *see New England Power*

**56**

*Co. v. New Hampshire,* 455 U.S. 331, 336–37 & n. 3, 102 S.Ct. 1096, 1099–1100 & n. 3, 71 L.Ed.2d 188 (1982), or a preference for local industry, *see Bacchus Imports, Ltd. v. Dias,* 468 U.S. 263, 268, 104 S.Ct. 3049, 3053, 82 L.Ed.2d 200 (1984).

Equally unavailing is the claim that section 1315 imposes unjustified burdens on interstate commerce. It is difficult to discern any burden imposed on interstate commerce by section 1315, and, even if some slight burden could be identified, it is adequately justified by the legitimate local interest in protecting local shareholders, *see CTS,* 481 U.S. at 93, 107 S.Ct. at 1651.

The order of the District Court is affirmed.