ROTH, Circuit Judge,
dissenting:
I do not dispute that the federal courts are precluded from reviewing a state court decision applying filed rates. However, I disagree with the majority that this is what is at issue. The issue here is whether the Commonwealth Court’s misinterpretation of FERC orders, defining a component of a rate, is subject to collateral attack in federal court. I would hold that it is.
Contrary to the Commonwealth Court’s assessment that the FERC orders in question are ambiguous, FERC has clearly classified the component “line loss” as a transmission related cost. Atl. City Elec. Co. v. PJM Interconnection, LLC (Atlantic City I), 115 FERC ¶ 61,132 (2006); Atl. City Elec. Co. v. PJM Interconnection, LLC (Atlantic City II), 117 FERC ¶ 61,-169 (2006) (denying rehearing of Atlantic City I); Pa.-N.J.-Md. Interconnection (PJM Interconnection I), 81 FERC ¶ 61,-257 (1997); Pa.-N.J.-Md. Interconnection (PJM Interconnection II), 92 FERC ¶ 61,-282 (2000) (denying rehearing and granting clarification of PJM Interconnection I). I therefore respectfully dissent.
I. Background
The dispute here starts in June 2007, when PJM, a facility that transmits wholesale electricity over an interstate grid, implemented a new pricing scheme. Atlantic City I, 115 FERC ¶ 61,132. This change resulted in an additional amount of over $250 million being charged for line loss to the Companies when they purchased power from PJM to be resold at retail. Line loss is the power lost as electricity is transmitted over a distance. The Companies sought permission from the PUC to pass this line loss expense along to their retail ratepaying customers. The PUC denied the request. The PUC held that the line losses were related to the cost of generation, and that the Companies had agreed to postpone any increase in generation costs until 2010. The Companies appealed to the Commonwealth Court arguing that the new charges are related to transmis *369 sion costs. The Commonwealth Court affirmed the PUC’s determination reasoning that the PUC’s classification was permissible because FERC has not expressly classified “line loss” as a transmission related cost. Metropolitan Edison Co. v. Pa. Pub. Util. Comm’n, 22 A.3d 353, 365. The Commonwealth Court is incorrect. FERC has clearly classified line losses as a transmission related cost. As a consequence, the Commonwealth Court lacked jurisdiction to interpret the FERC orders.
To understand these issues, I will go back to the enactment of the Federal Power Act (FPA) and the ensuing FERC oversight of the interstate transmission of electric power. In 1927, the Supreme Court held that the sale of electricity in interstate commerce falls under the exclusive jurisdiction of Congress. Pub. Utils. Comm’n v. Attleboro Steam & Elec. Co., 273 U.S. 83, 47 S.Ct. 294, 71 L.Ed. 549 (1927). In response, Congress enacted the FPA, “which authorized federal regulation of the interstate sale of electricity, and created a new independent agency, the Federal Power Commission (precursor to FERC), to administer the statute.” N.J. Bd. of Pub. Utils. v. FERC, 744 F.3d 74, 80 (3d Cir.2014). The FPA grants FERC exclusive regulatory authority over “all the facilities for such transmission or sale of electricity,” but reserves for the states regulatory authority over “facilities used for the generation of electric energy.” Id. (citing 16 U.S.C. § 824). In addition, the FPA tasks FERC with ensuring that “[a]ll rates and charges ... subject to the jurisdiction of the Commission ... be just and reasonable.” 16 U.S.C. § 824d(a). FERC’s approach to this task has been to review rates proposed by each facility, rather than to directly set the rates itself. N.J. Bd. of Pub. Utils., 744 F.3d at 81.
The Companies acquire electricity from PJM and deliver it to retail ratepayers. Id at 82. Pursuant to the FPA, the rate PJM charges the Companies for this transaction is regulated exclusively by FERC. Id. FERC has reviewed PJM’s rates on various occasions. Relevant here is FERC’s review of PJM rates calculated via the locational marginal pricing (LMP) methodology, which classifies line losses as a transmission related costs. See PJM Interconnection I, 81 FERC ¶ 61,257 (1997); see also PJM Interconnection II, 92 FERC ¶ 61,282 (2000); see also Atlantic City I, 115 FERC ¶ 61,132 (2006); see also Atlantic City II, 117 FERC ¶ 61,169 (2006).
In PJM Interconnection I, FERC approved a proposal by PJM to begin calculating rates based on the LMP methodology. Id. 81 FERC ¶ 61, 257. The issue to be decided by this ruling was the allocation of the additional cost to transmission caused by congestion of demand in certain areas. FERC summarized the purpose and mechanics of the LMP as follows:
The Commission accepted, with certain modifications, the Supporting Companies’ locational marginal pricing (LMP) model for calculating and recovering congestion costs. LMP is defined as the marginal cost of supplying the next increment of electric demand at a specific location on the electric power network, taking into account both generation and marginal cost and the physical aspects of the transmission system. When the PJM system is unconstrained, there is a single market clearing price for hourly energy equal to the marginal cost of meeting the last increment of demand. When transmission constraints occur on the PJM system, the marginal cost of energy varies by location because not all supply can be delivered to all demand. The differences between the LMPs at different locations represent congestion costs.
*370 PJM Interconnection II, 92 FERC at p. 61,952. In other words, the LMP accounted for two components, (1) generation and (2) transmission constraints, and at this time transmission constraints consisted of only transmission congestion. The generation component pertained to the cost of providing electricity absent transmission constraints. The transmission constraints component pertained to the additional costs incurred to meet demand of providing electricity in congested areas, which increases as congestion in an area increases. Accordingly, calculation of this cost creates an incentive for PJM to consider methods for alleviating congestion and “eneourage[d] efficient use of the transmission system.” PJM Interconnection I, 81 FERC at p. 62,253. For example, billing for congestion will “send price signals that are likely to encourage efficient location of new generating resources, dispatch of new and existing generating resources, and expansion of the transmission system.” Id.
In Atlantic City I, FERC issued an order requiring PJM to account for a third component in the LMP, “transmission line losses.” Id. 115 FERC ¶ 61,132. The “transmission line loss” component pertains to the additional costs incurred to compensate for the “loss of the scheduled megawatts as the power is transmitted from the point of generation to the point of delivery.” Id. at p. 61,474. In other words, the longer the distance that electricity travels across a power line, the greater the loss of power, creating the additional cost necessary to compensate for the power lost in transmission, i.e., line loss.
Prior to Atlantic City, “transmission line losses” were recovered under an average loss method. Id. at 61,473. The average loss method calculated losses separately from the LMP via an uplift charge, distributing losses equally among all loads. Id. In other words, customers in nearby locations paid the same amount as customers in more distant locations—the cost of the lost power being distributed equally among all customers. In Atlantic City, FERC mandated that PJM implement the marginal loss method, in which “the effect of losses on the marginal cost of delivering energy is factored into the energy price (i.e., the Locational Marginal Price, or the LMP) at each location.” Id. at 61,474. Under this method, the cost of line losses increases as the distance between generator and user increased. Id. Akin to calculating congestion costs, calculating line losses is an incentive to PJM to use the transmission grid more efficiently. For example, in an effort to decrease the costs of line loss, PJM will consider distance in determining “which generators to dispatch to meet its loadsf’M[1]
Pertinent here, PJM implemented the marginal loss method in June 2007, resulting in new charges to the Companies, reflecting the cost of transmitting power over long distances. The Commonwealth Court, in affirming the PUC, misinterpreted the above mentioned FERC orders, holding these orders to be ambiguous. On this basis, the court denied the Companies’ appeal to pass these costs on to retail ratepayers.
II. Preclusive Effects of the Commonwealth’s Determination
How we frame the question presented in this case matters a great deal. The Companies do not question that the Common *371 wealth Court can review rates to be charged to retail customers, taking into account the interstate rate charged by PJM. Rather, the Companies ask us to review the Commonwealth Court’s interpretation of one of these elements of the PJM rate, the charge for “line loss” as defined in the FERC orders.
The FPA clearly divests states of jurisdiction to interpret FERC orders that define the elements of the rates of transmission facilities, such as PJM. See New Orleans Pub. Serv., Inc. v. Council of New Orleans, 911 F.2d 993, 1001 (5th Cir.1990) (“Nantahala and Mississippi Power and Light reaffirmed the well-established principle that if FERC has jurisdiction over a subject, states cannot have jurisdiction over it”); see also N.J. Bd. of Pub. Utils., 744 F.3d at 82 (FERC has jurisdiction over rates set by PJM). It is true that the states have flexibility in reviewing rates. However, once FERC has defined an element of a rate, the states cannot redefine it.[2] The Commonwealth Court acknowledged as much in its ruling on this matter. According to the court, “[bjecause FERC’s opinions have not expressly stated that line loss costs are transmission costs, there is no direct conflict between the Commission’s Order and FERC.” Metropolitan Edison Co., 22 A.3d at 365. It is the Commonwealth Court’s conclusion that there was no conflict here with FERC that is at issue. As explained in depth below, FERC has clearly defined the element of “line loss,” and therefore, the Commonwealth Court’s interpretation is preempted.
As the majority indicates, we are not bound by preclusion when “Congress expressly ousts state courts of jurisdiction.” Haywood v. Drown, 556 U.S. 729, 771, 129 S.Ct. 2108, 173 L.Ed.2d 920 (2009). Therefore, preclusion does not apply here.
Furthermore, the Supreme Court has cautioned that a state-court judgment is subject to collateral attack when “the policy underlying the doctrine of res judicata is outweighed by the policy against permitting the court to act beyond its jurisdiction.” Durfee v. Duke, 375 U.S. 106, 115 n. 12, 84 S.Ct. 242, 11 L.Ed.2d 186 (1963) (quoting Restatement (First) of Conflict of Laws § 451(2) (Supp.1948)). In Travelers Indemnity, Co. v. Bailey, the Court provided similar guidance, noting that collateral attack is warranted under circumstances where “[allowing the judgment to stand would substantially infringe the authority of another tribunal or agency of government^]” 557 U.S. 137, 153 n. 6, 129 S.Ct. 2195, 174 L.Ed.2d 99 (2009). Additionally, this Court has noted:
When Congress intends a particular forum to have exclusive jurisdiction to determine the rights of the parties in a particular situation, that policy decision deprives other fora of subject matter jurisdiction. This doctrine of “forum preemption” implements Congressional determinations that development of the substantive law in a particular area should be left to a particular administrative agency created for that purpose.
Ry. Labor Exec. Ass’n v. Pittsburgh & Lake Erie R.R. Co., 858 F.2d 936, 939 (3d Cir.1988).
*372 Here, it is clear that the policy interests in preemption outweigh the policy interests of applying issue preclusion. Allowing the Commonwealth Court’s judgment to stand, without clarification, substantially infringes upon FERC’s exclusive authority over its own orders. Furthermore, the Commonwealth should not be permitted to use filed rates as a pretense for construing FERC orders solely to benefit retail ratepayers, the constituents of the PUC. Therefore, the Commonwealth Court’s assessment of FERC orders, as ambiguous, is subject to collateral attack.
III. Commonwealth’s Review of FERC Orders
The Commonwealth Court’s conclusion that the FERC orders “do not unambiguously state that [line losses] are transmission related” is flatly contradicted by FERC’s persistent use of the term “transmission line losses” throughout the orders of Atlantic City I and Atlantic City II. Metropolitan Edison Co., 22 A.3d at 356; see 115 FERC ¶ 61,132; see also 117 FERC ¶ 61,169. These repeated references explicitly classify “line losses” as related to “transmission.”
Furthermore, the language quoted by the court to illustrate ambiguity does nothing of the sort. According to the Commonwealth Court, FERC associated line losses with both transmission and generation. Metropolitan Edison Co., 22 A.3d at 365. First, the court referred to FERC’s statement that “marginal losses are a part of the payment for transmission service.” Id. (quoting 117 FERC at p. 61,863). Then, the court referred to language in Atlantic City I and Atlantic City II that seemingly associated line loss with the cost of generation. According to the Commonwealth Court:
FERC stated “locational marginal prices [ (how line losses are calculated) ] are at the core of the PJM pricing methodology, because marginal prices send the proper price signals about the cost of obtaining generation.” FERC then explained how line loss costs impact a utility’s decision regarding from which generator to purchase energy. Similarly, in Atlantic City I, FERC noted that requiring PJM to charge for line loss on a locational marginal basis “ensures that each customer pays the proper marginal cost price for the power it is purchasing” and that, in using marginal pricing, “PJM would change the way that it dispatches generators by considering the effects of losses.”
Id. (quoting Atlantic City I, 115 FERC at p. 61,478; Atlantic City II, 117 FERC at pp. 61,862, 61,863). The court was misguided.
In these statements, FERC simply illustrated the transmission related incentives that arise when line losses are calculated into the LMP. When line loss costs are calculated, PJM will attempt to shorten the route of delivering electricity by choosing the generators that are closest to the customers. Thus, this calculation encourages PJM to use the transmission system more efficiently. Atlantic City I, 115 FERC at 61,478.
Furthermore, FERC has indicated that similar incentives arise when congestion is calculated into the LMP, a cost that both the PUC and the Commonwealth Court have found to be related to transmission. PJM Interconnection I, 81 FERC at p. 62,253; Metropolitan Edison Co., 22 A.3d at 356. FERC noted that calculating congestion costs would “send price signals that are likely to encourage efficient location of new generating resources, dispatch of new and existing generating resources, and expansion of the transmission system.” PJM Interconnection I, 81 FERC at p. 62,253. Accordingly, the calculation “en *373 courage[s] efficient use of the transmission system.” Id. It is noteworthy that neither the PUC nor the Commonwealth Court found this statement to be ambiguous in their finding that congestion was related to transmission, and not generation.
Finally, the Commonwealth Court referred to language in PJM Interconnection I and PJM Interconnection II that seemingly associated line loss with the cost of generation. Metropolitan Edison Co., 22 A.3d at 365. According to the court, “FERC did refer to the amount of line losses as being related to transmission; however, it also indicated that ‘the price of line losses is related to generation, and the cost of generation is determined by LMP.’” Id. (quoting PJM Interconnection, 92 FERC at p. 61,960). The court took this statement out of context.
At the time PJM Interconnection was decided, the LMP calculated two cost components, generation and the transmission constraints of congestion. PJM Interconnection II, 92 FERC at 61,952. In PJM Interconnection II, FERC noted, “[w]hen transmission constraints occur on the PJM system, the marginal cost of energy varies by location because not all supply can be delivered to all demand.” Id. Meanwhile, generation refers to the baseline cost for providing electricity absent transmission constraints, which does not vary by location. Id. At the time, line losses were not associated with transmission constraints, but rather, were calculated via an uplift charge. Atlantic City I, 115 FERC at 61,473. Thus, like generation, line losses did not vary by location. It is therefore understandable why FERC, at that time, might categorize line losses with generation, as opposed to transmission.
However, under LMP, the Commonwealth Court’s assessment of FERC orders as ambiguous is misplaced. It is clear that in conjunction with LMP, FERC has consistently classified line loss as a transmission related cost.
IV. Conclusion
In focusing on the Companies’ attempt to have us review the Commonwealth’s substantive determination under the filed rate doctrine, the majority misses the forest for the trees. The state may not improperly interpret a matter outside of its jurisdiction when the matter has been left to the exclusive jurisdiction of FERC.[3] Be *374 cause our review is not precluded and FERC has clearly spoken, I respectfully dissent. Thus, I conclude that this matter should be remanded to the District Court with instructions to issue an order enjoining the PUC and its Commissioners from asserting jurisdiction to define line losses in any manner other than is provided by FERC, ie., that “marginal losses are part of the payment for transmission service.” Atl. City Elec. Co., 117 FERC at 61,858.

. In a separate order, FERC noted that prior to the implementation of the marginal loss method, ‘‘[flosses were not included in the calculation of LMPs, and thus, were not recovered in the LMP energy prices collected from loads.” Black Oak Energy, LLC, 122 FERC ¶ 61,208 (2008).

. It is FERC's prerogative to determine the elements that go into a filed rate. In Nant-ahala the element in question was the percentage of entitlement power to be allocated between two utilities. In the present case, the element is "line loss” and its classification by FERC as an element of transmission. Once FERC has spoken on the definition of any such element, the matter is preempted. The states may not then dispute that classification. The Commonwealth Court’s conclusion that there was no conflict here with FERC is invalid for the reasons set forth above.

. From the beginning the Companies have taken the position that this is a matter that can only be determined by FERC. And, in essence, this is the question asked by the Companies in their petition for certiorari to the Supreme Court:
The Federal Power Act, 16 U.S.C. §§ 824 et seq., grants the Federal Energy Regulatory Commission ("FERC”) “exclusive authority to regulate the transmission and sale at wholesale of electric energy in interstate commerce.” New England Power Co. v. New Hampshire, 455 U.S. 331, 340, 102 S.Ct. 1096, 71 L.Ed.2d 188 (1982). A regional transmission organization ("RTO”) implementing its federal tariff charged petitioners for "transmission line losses”—the energy that dissipates when electricity is transmitted through wires. Although it was undisputed that the RTO imposed those charges as a cost of transmission, the Pennsylvania Public Utility Commission and the court below barred petitioners from recovering those federally imposed costs in retail rates by ruling that "transmission line losses” are generation costs (a cost of producing electricity), not transmission costs. Notwithstanding the filed rate doctrine, they deemed it irrelevant that the RTO had imposed the charges as "transmission” costs. They held that state regulators were free to recategorize the charges because FERC had not "unambiguously” or "explicitly” declared that "transmission line losses” are "transmission costs.” The questions presented are:

1. Whether, contrary to a decision of the Fifth Circuit, the Federal Power Act and filed rate doctrine permit a state public utility commission to deny recovery of FERC-man-
*374
dated charges by classifying those costs differently from the entity responsible for administering the federal tariff on the ground that the tariff and FERC's orders do not "unambiguously” or "explicitly” foreclose the State’s chosen classification.

2. Whether, contrary to a decision of the D.C. Circuit, "transmission line losses" reflect the costs of generating electricity rather than the costs of transmitting it.
Petition for Writ of Certiorari, Metro. Edison Co. v. Pa. Pub. Util. Comm’n, - U.S. -, 133 S.Ct. 426, 184 L.Ed.2d 289 (2012) (emphasis added). The fact that the Supreme Court did not grant certiorari does not mean that this question may not be validly raised in federal district court. Cf. White v. Ragen, 324 U.S. 760, 767, 65 S.Ct. 978, 89 L.Ed. 1348 (1945) ("A denial of certiorari by this Court in such circumstances does not bar an application to a federal District Court for the relief, grounded on federal rights, which the Supreme Court of Illinois has denied.”).